**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL S. STRINGER,** | * | |
| | * | |
|    **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **Civil Action No.  11-00662-B** |
| | * | |
| **CAROLYN W. COLVIN,**[1] | * | |
| **Commissioner of Social Security,** | * | |
| | * | |
|    **Defendant.** | * | |

<u>**ORDER**</u>

Plaintiff, Michael S. Stringer (hereinafter "Plaintiff"), brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(c).  On October 12, 2012, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 16).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

**I.**   <u>**Procedural History**</u>

Plaintiff protectively filed an application for supplemental security income benefits on December 9, 2009. (Tr. 108-115).  Plaintiff alleges that he has been disabled since December 9,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), <u>Federal Rules of Civil Procedure</u>, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2009, due to "alcoholism, bad liver, bad kidneys, and respiratory failure." (Id. at 122). Plaintiff's application was denied initially (id. at 69-73), and he timely filed a Request for Hearing (id. at 74-75). On February 23, 2011, Plaintiff, without representation, attended an administrative hearing before Administrative Law Judge Renee Hagler (hereinafter "ALJ"). (Id. at 33-58). The ALJ informed Plaintiff of his right to be represented at the hearing. (Id. at 35-36). Plaintiff signed a form indicating that he understood his rights and that he knowingly waived his right to representation. (Id. at 36). A vocational expert ("VE") also appeared at the hearing and provided testimony. (Id. at 53-56).

On June 11, 2011, the ALJ wrote Plaintiff and provided him with additional medical evidence that she was entering into the record. (Id. at 29). Plaintiff was advised that he could request a supplemental hearing in order to present additional evidence and that if a written request was not received within ten days of receipt of the letter, the ALJ would assume that Plaintiff did not desire a supplemental hearing and would issue a decision. (Id.). Eight days later, on June 14, 2011, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 15-28). Plaintiff sought review before the Appeals Council (hereinafter "AC"), and submitted additional evidence. (Id. at 4). The Appeals Council reviewed the additional evidence and, on September 30, 2011, determined that it provided no basis for changing the ALJ's decision. Thus, Plaintiff's request for review was denied. (Id. at 5-8). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

II.    **Issues on Appeal**

A.    Whether the ALJ erred in formulating Plaintiff's residual functional capacity in the absence of a functional assessment completed by a treating or examining physician?

 B.   Whether the ALJ violated Plaintiff's due process rights by rendering
 her decision during the ten-day period that Plaintiff was given for
 requesting a supplemental hearing?

**III.   Factual Background**

Plaintiff was born on November 18, 1969, and was forty-one years of age at the time of the February 23, 2011 administrative hearing. (Tr. 39).   Plaintiff's educational background consists of a GED and job training skills. (Id.).   Plaintiff's last worked in July 2007 as a graphic designer and sign erector for a sign company.   Plaintiff's employment ended because the company closed. (Id. at 40, 129).   Plaintiff also worked as an automobile detailer, a stucco worker and a window tinter during various times throughout the past fifteen years. (Id. at 40-42). Plaintiff testified that has not looked for work since 2007 because he has been fighting "neurology" in his head. (Id. at 42).

Plaintiff also testified that his problems include trigeminal neuralgia[2] and ulcerative colitis[3]. (Id. at 44, 48).   According to Plaintiff, the trigeminal neuralgia, causes his head to swell up, and makes him feel like he has been hit in the side of the face with a baseball bat.   Plaintiff testified that his trigeminal neuralgia attacks last anywhere from 15 minutes to up to two or three days, that he takes Lyrica and Carbamazepine for the attacks, and while the medicine helps, it makes him "goofy" and knocks him completely out. (Id. at 44-46) Plaintiff also testified that his colitis causes him to go to the restroom sometimes up to fifteen times a day, and that he takes

---

[2] Trigeminal neuralgia (TN), also called tic douloureux, is a chronic pain condition that affects the trigeminal or 5th cranial nerve, one of the largest nerves in the head.   The disorder causes extreme, sporadic, sudden burning or shock-like face pain that lasts anywhere from a few seconds to as long as 2 minutes per episode. See (www.ninds.nih.gov/disorders/trigeminal _neuralgia/detail_trigeminal_neuralgiat.htm) (Last visited: March 29, 2013).

[3] Ulcerative colitis is a disease that causes ulcers in the lining of the rectum and colon. It is one of a group of diseases called inflammatory bowel disease. Ulcers form where inflammation has killed the cells that usually line the colon.

Prevacid for this condition. (Id. at 44).   Plaintiff testified that he smokes a half a pack of cigarettes a day, and that he has not used illegal drugs in approximately two years. (Id. at 43).

Plaintiff testified that he is not sure how far he can walk, but gave an example of walking around the mall. (Id. at 48).  Plaintiff was also not sure how long he can stand, but with respect to sitting, Plaintiff did indicate that he needs to adjust and stand up after sitting fifteen to twenty minutes due to pain in his back. (Id. at 49).  Plaintiff also testified that he is able to go to the grocery store and to the bank, but because he does not have a valid driver's license, he has to rely on others for transportation.[4] (Id. at 48-51).   Plaintiff testified that he can lift up to fifty pounds; he can climb stairs (slowly), squat, and bathe and dress himself. (Id. at 50, 52). Plaintiff further testified that he can wash dishes, do laundry, make the bed, take out trash, shop, and prepare simple meals.  According to Plaintiff, he is not sure if he can iron, sweep, mop, or vacuum because he "ha[s]n't really done it"[5]. (Id. at 51-52).  Additionally, Plaintiff testified and indicated in his Function Report that he is able to maintain a bank account, pay bills, read, write, add, subtract, multiply, divide, and make change. (Id. at 39-40, 159).

**IV.**   **Analysis**

**A.**   **Standard Of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by

---

[4] On his Function Report dated February 9, 2010, Plaintiff stated that he does not drive because "he would not trust himself driving." (Tr. 159).  On his Drug and Alcohol Use questionnaire dated January 14, 2010, Plaintiff indicated that he has been arrested on multiple occasions for driving under the influence. (Id. at 142); see also (id. at 164) (indicating that Plaintiff has "had three DUIs").  In his administrative hearing on February 23, 2011, Plaintiff informed the ALJ that he is currently on felony probation for eluding police officers. (Id. at 42-43) (stating "I just - - didn't stop.  I didn't really run from them, I just didn't stop.").

[5] Plaintiff testified that he lives with his parents. (Tr. 38-39).

substantial evidence and 2) whether the correct legal standards were applied.[6] <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Id.</u>; <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

     **B.**     **<u>Discussion</u>**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[7] 20 C.F.R.

---

[6]  This Court's review of the Commissioner's application of legal principles is plenary. <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

[7]  The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is

§§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since December 9, 2009, and that he has the severe impairments of trigeminal neuralgia and colitis.[8] (Tr. 20).   However, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 22).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform less than the Full Range of medium work. (Id.).   Specifically, the ALJ found that Plaintiff is limited to work which will only require him to occasionally lift/carry 50 pounds, and to frequently lift/carry 25 pounds. (Id.).   He can sit for 8 hours and stand/walk in combination for 6 hours, during an 8-hour workday. (Id.).   Additionally, plaintiff will need the

---

automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); see also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[8] The ALJ determined that Plaintiff has a history of polysubstance abuse, which includes cannabis, Klonipin, tobacco, marijuana, and alcohol. (Tr. 20).  Because Plaintiff testified that he has stopped using drugs and alcohol and Plaintiff has not been treated for usage since his hospitalization in November 2009, the ALJ concluded that this impairment was non-severe. (Id.).

ability to alter body positions at 2-hour intervals.[9] (Id.).

Utilizing the services of a VE, the ALJ determined that Plaintiff is capable of performing his past relevant work (hereinafter "PRW") as an automobile detailer, glass inter, stucco worker, graphic designer, and sign erector as the "work does not require the performance of work-related activities precluded by" Plaintiff's RFC. (Id. at 25). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

### 1. **Medical Evidence**

The relevant evidence of record reflects that on November 25, 2009, Plaintiff presented to the emergency room at Baptist Hospital (hereinafter "Baptist") because he "want[ed] to detox" (id. at 180) as a result of "ingest[ing] 64[10] Darvocet tablets along with alcohol consumption and marijuana use."[11] (Id. at 179). Physicians noted, "acetaminophen overdose, alcohol withdrawal, polysubstance dependence, and past liver failure." (Id. at 188). During evaluation, Plaintiff admitted to a history of "chronic alcohol dependence, polysubstance dependence, and also [a] recent cessation of alcohol consumption," which caused him to experience "withdrawals" for which he used "Lortab and other pills to self medicate because of the discomfort and problems

---

[9] The ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce some of his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they are inconsistent with the RFC assessment. (Tr. 23).

[10] Plaintiff reported taking "approximately 125 pills consisting of Darvocet and Lortab in order to 'help with [his] withdrawal symptoms.'" (Tr. 182).

[11] Plaintiff's urine toxicology screen was positive for phencyclidine (PCP), although the Plaintiff denied use of the drug. (Id. at 186). PCP (street named: Angle Dust, ozone, wack, and rocket fuel) is a synthetic drug sold as tablets, capsules, or white or colored powder. It can be snorted, smoked, or eaten. http://www.drugabuse.gov/drugs-abuse/pcpphencyclidine. Last visited: March 19, 2013.

that he was having during withdrawal.[12]" (Id.).  Plaintiff's treatment lasted until his discharge date of December 16, 2009. (Id. at 179).  During his hospitalization Plaintiff was treated for respiratory distress, pneumonia, and diarrhea associated with severe abdominal pain. (Id.).

While hospitalized, Plaintiff underwent an abdominal/pelvic CT scan, which was notable for colitis in various parts of his colon. (Id.).  On December 15, 2009, Plaintiff underwent a colonoscopy, which showed a normal prostate, no colon polyps (id. at 196), and was notable for colitis but was negative for infection (id. at 179).  On December 16, 2009, Plaintiff was placed on Flagyl and Ciprofloxacin and was discharged once his diarrhea had resolved.  Upon discharge, Plaintiff's diagnoses was acetaminophen toxicity secondary to Darvocet overdose, aspiration pneumonia, respiratory failure status post intubation, polysubstance abuse with cannabis, klonopin, tobacco and alcohol, hepatotoxicity secondary to acetaminophen toxicity, acute lung injury/aspiration pneumonia, and status post respiratory failure. (Id.).  Plaintiff was also prescribed Seroquel and advised of the possible side effects.  He was also instructed to follow up with Mobile Mental Health Center for psychiatric and therapy while attending a dual diagnosis group or day treatment program for rehabilitation. (Id. at 179, 190).

A week later on December 23 and 25, 2009, Plaintiff presented to the emergency room at Baptist Hospital with complaints of abdominal pain. (Id. at 212, 229).  A CT scan of Plaintiff's abdomen was taken and compared with one from December 15th.  The treatment records reflect that '[c]hanges of colitis involving the transverse and descending colon persist although they do look improved". It was also noted that Plaintiff's "liver, spleen, pancreas, adrenal glands, kidneys and small bowl looked normal", that normal functioning of the kidneys was observed, and that the lung bases showed some minimal basilar atelectasis. (Id. at 212).  Plaintiff was

---

[12] During the hearing Plaintiff testified that he ingested the Darvocet to ease his colitis pain. (Tr. 47).

prescribed medication to address symptoms and pain. (Id. at 216, 230).

On February 10, 2010, Dr. Donald Hinton, Ph.D. completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment of Plaintiff. (Id. at 231-247). Dr. Hinton diagnosed Plaintiff with Polysubstance abuse and opined that Plaintiff has mild restrictions in activities of daily living, and moderate restrictions in maintaining social functioning and concentration, persistence, or pace.  He opined that Plaintiff would experience no episodes of decompensation. (Id. at 239, 241).  In the mental RFC assessment, Dr. Hinton found that Plaintiff is moderately limited in the areas of understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention for extended periods, interacting appropriately with the general public, and responding appropriately to changes in the work setting. (Id. at 245-46).  Dr. Hinton concluded that Plaintiff "has the ability to understand, remember, and carry out very short and simple instructions." (Id. at 247).  Also, he determined that Plaintiff can attend for two-hour periods; that his contact with the general public should be limited; and that any changes in his work setting should be minimal. (Id.).

On March 29, 2010, Plaintiff was seen at Gastroenterology Associates (Baptist Division) for a follow-up visit following his December 2009 hospitalization. (Id. at 255).  Plaintiff reported that he was doing well but complained of pain in his lower extremities.  Plaintiff denied any GI complaints or symptoms of liver stigmata.  Upon examination, Plaintiff's bilateral breath sounds were equal and clear to auscultation, his heart rate and rhythm was regular, his abdomen was soft and nontender, and his bowel sounds were normoactive.  The nurse practitioner, Nurse Donita Johnson, ARNP, noted that Plaintiff appeared "to be doing fairly well" and did not need another colonoscopy until age 50[13]. (Id.).  She also suggested that Plaintiff see a primary care physician

---

[13] Plaintiff was 40 years old at the time – born 11/18/1969. (Tr. 39).

for his complaints of pain in his lower extremities. (Id.).

It appears that Plaintiff next sought treatment at the Gastroenterology Associates (Baptist Division) nearly a year later on January 10, 2011.  Plaintiff reported "moderate" abdominal pain. (Id. at 253).  A physical examination of Plaintiff was essentially normal; tenderness was present in his epigastrium.  The attending physician scheduled an upper gastrointestinal endoscopy, which revealed mild gastritis and a hiatal hernia. (Id. at 251).  The biopsy was negative. (Id. at 252).  Plaintiff was diagnosed with moderate to severe reflux disease and prescribed Prevacid. (Id. at 251).  Plaintiff returned to Gastroenterology Associates (Baptist Division) for a follow-up visit on January 31, 2011.  He reported "mild" rectal incontinence (3-4 bowel movements per day), and denied any associated abdominal pain, diarrhea, constipation, or weight loss. (Id. at 249).  A physical examination of Plaintiff was normal.  The attending physician renewed Plaintiff's prescription for Prevacid and recommended an over the counter fiber supplement. (Id.).

The record reflects that Plaintiff began treatment with Dr. George Dmytrenko, M.D., Ph.D. on January 6, 2011 for severe reoccurring facial pain.  Plaintiff reported to Dr. Dmytrenko that he smokes and that he had resumed drinking because his pain had become so bad. (Id. at 262).  Dr. Dmytrenko noted that Plaintiff was well developed and well nourished and had "recuperated nicely" from the illnesses associated with his overdose. (Id.).  Dr. Dmytrenko observed that his cranial nerve examination demonstrates flat discs with spontaneous venous pulsations, that Plaintiff had a hazy scarred right tympanic membrane, and that his right membrane was normal.  Dr. Dmytrenko also observed that while Plaintiff demonstrated normal bulk, tone and strength, he walked with a narrow based gait, and used a cane because of a limp. (Id.).  Dr. Dmytrenko diagnosed Plaintiff with trigeminal neuralgia based on "history and

examination", and prescribed Tegretol.  Plaintiff was directed to follow-up in a month.  (Id.).

When Plaintiff returned to Dr. Dmytrenko on February 7, 2011, Plaintiff requested a switch in his medication from Tegretol to Vicoprofen and reported that Tegretol gave him a "drug feeling." (Id. at 261)  Plaintiff also indicated that "a bottle of 100 [Vicoprofen] will last him upwards of three months." (Id.).  Dr. Dmytrenko observed that Plaintiff was not experiencing any real tic symptoms at the time. (Id.).  He switched Plaintiff's prescription to Vicoprofen and directed Plaintiff to return in six months. (Id.).

Over a month after the ALJ issued her decision denying benefits, Plaintiff, on July 25, 2011, visited the Mobile County Health Department with complaints of trigeminal neuralgia. (Id. at 268).  Dr. Gregory Evans, M.D., noted that Plaintiff was "not feeling tired or poorly", was in no acute distress, and had no depression. (Id.).  He also observed that Plaintiff had no headache, no abdominal pain, no chest pain or discomfort, no back pain and no localized pain, and was "not chronically ill". (Id.).  With respect to Plaintiff's neurology, Dr. Evans noted normal cranial nerves, some sensory abnormalities, and a decreased response to pain and temperature stimulation. (Id.).  With respect to Plaintiff's left face, no sensory abnormalities were noted.  Additionally, a motor exam demonstrated no dysfunction, and no coordination/cerebellum abnormalities were noted. (Id.).  Dr. Evans diagnosed Plaintiff with alcoholic cerebellar degeneration and isolated elevated blood pressure, prescribed Flexeril (for spasm) and Ultram as needed (for pain). (Id.).

On September 13, 2011, Dr. Dmytrenko completed a Clinical Assessment of Pain in reference to Plaintiff's illness. (Id. at 272).  With respect to the significance of pain, Dr. Dmytrenko opined that "Pain is frequently present to such an extent as to be distracting to the adequate performance of work activities." (Id.).  With respect to the extent that Plaintiff's

medications will impact his ability to perform work-related activities, Dr. Dmytrenko selected "Medication side effects can be expected to be severe and to limit patient's effectiveness due to distraction, inattention, drowsiness, etc." (Id.).

> **2.** **Issues**
>
> > **a. Whether the ALJ erred in rendering Plaintiff's residual functional capacity without basing it on one completed by a treating or examining physician?**

In his brief, Plaintiff argues that the ALJ erred in failing to adequately develop the record because she rendered Plaintiff's RFC without the support of a treating or examining physician. (Doc. 11 at 4). Specifically, Plaintiff points out that "there is no consultative evaluation of record" to support the ALJ's determination that Plaintiff is capable of performing a reduced range of medium work. (Id. at 6). Thus, the crux of Plaintiff's argument is that the ALJ failed to require a consultative evaluation and in doing so, failed to adequately develop the record with evidence sufficient to support the ALJ's RFC assessment. Having reviewed all of the evidence in this case, the Court finds that the ALJ did not err in rendering Plaintiff's RFC based on the evidence of record and that substantial evidence in this case supports the ALJ's RFC determination.

An administrative hearing before an ALJ is not adversarial in nature. Thus, it is well-established that "the ALJ has a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam). This duty to develop the record exists even when the claimant is represented by counsel. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995). In fulfilling the duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such is necessary to enable the ALJ to render a decision. Holladay v. Bowen, 848 F.2d 1206, 1210 (11th Cir. 1988) (the ALJ is not

required to order a consultative examination and has discretion to order such an exam only when necessary); see also Good v. Astrue, 240 Fed. App'x 399, 404 (11th Cir. 2007) (rejecting claim that ALJ reversibly erred in failing to order an additional consultative examination because no physician had recommended an additional consultation and the record contained sufficient evidence to permit the ALJ's RFC determination).   While the ALJ is responsible for making every reasonable effort to obtain from the claimant's treating physician(s) all the medical evidence necessary to make a determination as to disability, it is the claimant's burden to prove he is disabled and to produce evidence in support of her claim. See Ellison, 355 F.3d at 1276; 20 C.F.R. § 416.912(a) and (c); see also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

In this case, the record reflects that the ALJ took steps to retrieve those medical records of which she was aware. (Tr. 37, 44-45, 47).   Indeed, the record reflects that following the administrative hearing, the ALJ obtained additional medical records based on Plaintiff's testimony at the hearing. Further, the ALJ's decision contains a through discussion of the medical evidence in the record. (Id.).   Based on a review of the record, the Court finds that the record contained sufficient evidence for the ALJ to render a decision in this case; thus, no consultative evaluation was necessary.

As detailed above, Plaintiff's onset of illness stemmed from his overdose on Darvocet and Lortab in December 2009.   During his hospitalization in connection therewith, Plaintiff experienced, inter alia, respiratory distress, pneumonia, and severe abdominal pain. (Tr. 179). At the time of his discharge, Plaintiff showed improvement and was encouraged to seek mental health treatment.   There is no indication in the record that Plaintiff ever sought any mental health treatment and during an examination through the Mobile County Health Department in July 2011, no depression or other psychological issues were noted. (Id. at 268).

13

With respect to Plaintiff's colitis, Plaintiff's treatment records show that he suffers from moderate to severe reflux disease (id. at 251), which gradually improved with treatment. (Id. 178-97, 213, 229). The record reflects that following his December 2009 hospitalization, Plaintiff had three follow-up visits with Gastroenterology Associates (Baptist Division), one in March 2010 and two in January 2011. Notably, in March 2010, Plaintiff reported that he was "doing well" and denied any GI complaints. (Id. at 255). While Plaintiff claims that he sometimes goes to the restroom up to fifteen times a day (id. at 46), this assertion has never been documented by any of his treating physicians. (See Id. at 249-60). To the contrary, when Plaintiff sought treatment for "moderate" symptoms in January 2011, he reported to the physician that he was experiencing three to four bowel movements a day. (Id. at 249). This assertion was consistent with a usual course of treatment in which the physician only prescribed Prevacid and recommended that he begin taking an over-the-counter fiber supplement (id. at 249), after which he did not return to the doctor about his colitis. Notably, at no time did any treating physician note in their medical records that Plaintiff was experiencing any functional limitations as a result of this condition.

Similarly, with respect to Plaintiff's trigeminal neuralgia, no consultative evaluation was necessary to further develop the record as the ALJ based her determination on the fact that Plaintiff "has not received the type of medical treatment one would expect for a totally disabled individual." (Id. at 46). "His treatment [was] limited to medications," which Plaintiff admitted at the hearing helps and eases the pain. (Id.). Indeed, Dr. Dmytrenko's treatment records indicate a usual course of treatment consisting of Lyrica and Tegretol, which he switched to Vicoprofen (id. at 261-62) at Plaintiff's request specifically to counter the "drug feeling" that Plaintiff complained about. (Id. at 261). Further, during Plaintiff's only other treatment by Dr.

Dmytrenko, Dr. Dmytrenko noted that Plaintiff was not experiencing any tic symptoms at that time. In fact, it does not appear that Plaintiff saw Dr. Dmytrenko again until he completed the pain assessment months later. Further, while Dr. Dmytrenko observed during his initial office visit that Plaintiff walked with a narrow based gait, none of the other medical records indicate that Plaintiff had problems with his gait, or that he needed a cane.

Indeed, when Plaintiff presented to Dr. Evans complaining of "trigeminal neuralgia" Dr. Evans did not note any mobility problems. Instead, he noted upon examination, that Plaintiff was "not feeling tired or poorly", was in no acute distress, had no headache, no abdominal pain, no chest pain, and no discomfort, and was "not chronically ill". (Id. at 268). His course of treatment included only prescriptions for Flexeril (for spasm) and Ultram as needed (for pain). (Id.). None of the treating physicians noted that Plaintiff's medical conditions resulted in any functional limitations. Notably, in February 2011, Plaintiff informed Dr. Dmytrenko that the Vicoprofen would last him about three months; however, he did not seek any more medication until July 2011 when he presented to Dr. Evans. In fact, it appears that Plaintiff only sought treatment for this illness on a total of three occasions, one of which was a follow-up appointment. Each time he was only prescribed medication to reasonably regulate his symptom, which indicates that Plaintiff's impairments did not result in any functional limitations or a disabling condition. Dawkins v. Bowen, 848 F.2d at 1213; see also Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (opining that when a course of treatment is "entirely conservative in nature" Plaintiff's allegation of disabling pain may be discounted).

In addition to Plaintiff's medical records, his testimony at the administrative hearing provided the ALJ with the information needed to render a decision in this case. In determining Plaintiff's RFC, the ALJ noted that "[d]espite [Plaintiff's] allegations of disability he admitted

that he is able to walk around the mall; stand as long as his legs will allow; sit for 15–20 minutes at a time; . . . lift 50 pounds; . . . slowly climb stairs; squat; . . . prepare simple meals; and perform light household chores. (Tr. 23). Thus, the ALJ determined that Plaintiff's assertions "concerning the intensity, persistence and limiting effects of [his] symptoms [were] not credible to the extent that they [were] inconsistent with" her RFC assessment. (Id.). Further, the record reflects that Plaintiff acknowledged that he is able to dress himself, bathe himself, cook meals, pay bills, count change, handle a savings account, chat online, send emails, and walk around the grocery store. (Id. at 157-60).

Because the record contains sufficient information upon which the ALJ was able to base her decision, and because there is nothing before the Court that demonstrates that Plaintiff may have either physical or mental limitations beyond those included in the RFC as determined by the ALJ, the undersigned finds that the ALJ did not err in rendering a decision without a consultative examination. The ALJ's RFC assessment and finding that Plaintiff can perform a reduce range of medium work is supported by substantial evidence. Thus, Plaintiff's claim is without merit.

> **b. Whether the ALJ violated Plaintiff's due process rights by rendering her decision during the ten-day period that Plaintiff was allowed to request a supplemental hearing?**

In his brief, Plaintiff argues that the ALJ violated his due process rights by "failing to allow [Plaintiff] the opportunity to request a supplemental hearing after [the ALJ] obtained post-hearing evidence." (Doc. 11 at 11). Following Plaintiff's hearing, the ALJ obtained additional medical records that Plaintiff referenced during the hearing. (See Tr. 38 (outlining only exhibits F-1 through F-5); compare with id. at 27-28 (outlining F-1 through F-8)). Upon receipt of the records, the ALJ properly proffered the records to Plaintiff. (Doc. 11 at 17-18). Included with the

updated records was correspondence dated June 6, 2011 that outlined the relevant HALLEX[14]

policy, which provides in pertinent part:

> You may submit any or all of the following: written comments concerning the enclosed evidence, a written statement as to the facts and law you believe apply to the case in light of that evidence, and any additional records you wish me to consider (including a report from the treating physician).  You may also submit written questions to be sent to the author(s) of the enclosed report(s).
>
> You may also request a supplemental hearing at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law.  If you request a supplemental hearing, I will grant the request unless I receive additional records that support a fully favorable decision.
>
> If I do not receive a response from you within ***10 days*** from the date you receive this notice, I will assume that you do not wish to submit any written statements or records and that you do not wish to request a supplemental hearing or to orally question the author(s) of the enclosed report(s).  ***I will then enter the enclosed evidence in the record and issue my decision***.

 (Tr. 29-30) (emphasis added).  Subsequently, the ALJ issued an unfavorable opinion dated June

14, 2011, eight days after the date of the correspondence. (Id. at 25).  Plaintiff contends that

because the ALJ rendered her decision denying benefits before expiration of the ten-day time

period outlined in the HALLEX policy, his rights to due process were violated. (Doc. 11, 11-14).

While it is not clear or logical to the undersigned why the Agency would not observe its own

rules with respect to the ten-day time period outlined in the HALLEX policy, the undersigned is

constrained to find in this case, Plaintiff's due process rights were not violated because he has

not demonstrated prejudice.

The fundamental requirement of due process is the opportunity to be heard "at a

meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct.

---

[14] "HALLEX", the Hearings, Appeals, and Litigation Law Manual, is a policy manual written by Social Security Administration to provide policy and procedural guidelines to ALJs and other staff members. See Moore v. Apfel, 216 F.3d 864, 868 (9th Cir. 2000).

893, 47 L.Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187,

1191, 14 L.Ed.2d 62 (1965)).  Under 42 U.S.C. § 405(b)(1), when a hearing is held, the disability

determination must be made "on the basis of evidence adduced at the hearing."  Post-hearing

evidence is therefore afforded special treatment to ensure that the claimant is given the

opportunity to respond, rebut, and request cross-examination.  The HALLEX indicates that

proffer of post-hearing evidence is required unless the claimant has knowingly waived his right

to examine the evidence or the ALJ proposes to issue a fully favorable decision. (Tr. 29).

However, the HALLEX is a policy manual written by the Social Security Administration that

provides policy and procedural guidelines for ALJs. Maiben v. Astrue, 2010 U.S. Dist. LEXIS

19829 (S.D. Ala. Mar. 4, 2010).  In an unpublished case, the Eleventh Circuit addressed whether

a claimant is entitled to remand upon the assertion that the ALJ deviated from the procedures set

forth in the HALLEX.  The Eleventh Circuit stated, in pertinent part, the following:

> We have held that the sixth sentence of § 405(g) "provides the **sole** means for
> a district court to remand to the Commissioner to consider new evidence
> presented for the first time in district court." Ingram v. Comm'r of Soc. Sec.
> Admin., 496 F.3d 1253, 1267 (11th Cir. 2007) (emphasis added).  HALLEX
> is an agency handbook for the SSA not mentioned in §405(g), so it cannot
> serve as the basis to remand Carroll's case.  Moreover, we have held that an
> agency's violation of its own governing rules must result in prejudice before
> we will remand to the agency for compliance.  See Hall v. Schweiker, 660
> F.2d 116, 119 (5th Cir. Unit A Sept. 1981) (per curiam).

Carroll v. Soc. Sec. Admin. Comm'r, 453 Fed. App'x 889, 892 (11th Cir. 2011) (unpublished).

See also Gordon v. Astrue, 249 Fed. App'x 810, 813 (11th Cir. 2007) (unpublished) ("there must

be a showing of prejudice before [the court] will find that the claimant's right to due process has

been violated to such a degree that the case must be remanded to the Secretary for further

development of the record.").

In the case *sub judice*, Plaintiff argues at length regarding the ALJ's deviation from HALLEX policies; however, there is no suggestion, let alone any evidence that the apparent violation of Agency procedures resulted in any prejudice to Plaintiff.  In fact, the record reflects that following the hearing, Plaintiff proffered additional materials to the AC, namely the evaluation by Dr. Evans and the pain assessment by Dr. Dmytrenko.  The AC reviewed the records, and then denied Plaintiff's request for review based upon its finding that the records would not have changed the outcome of the case. (Tr. 6).

Like the AC, the undersigned finds that these records would not have changed the outcome of this case even if they had been presented to the ALJ.  Dr. Dmytrenko's opinion that the side effects of Plaintiff's medication severely limit his ability to perform work-related activities is in stark contrast to his own treatment records which reflect that he successfully treated Plaintiff with Vicoprofen, and during his last visit, Plaintiff did not show any signs of tic. (Id. at 261).  Dr. Dmytrenko's pain assessment is not only in stark contrast to his own treatment records, but it is also inconsistent with the other medical evidence that was before the ALJ, Plaintiff's testimony at the hearing, and the evaluation by Dr. Evans, which was submitted to the AC.  During his examination of Plaintiff in July 2011, Dr. Evans observed that Plaintiff was "not feeling tired or poorly", was in no acute distress, had no headache, no abdominal pain, no chest pain, and no discomfort, and was "not chronically ill".  As noted, Dr. Evans diagnosed Plaintiff with alcoholic cerebellar degeneration and isolated elevated blood pressure, prescribed Flexeril (for spasm) and Ultram as needed (for pain). (Id.).  The undersigned finds that this evidence would not have altered the ALJ's decision.  Because Plaintiff has failed to establish prejudice, his due process claim is without merit.

**V.** **Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income be **AFFIRMED.**

**ORDERED** this **29th** day of **March, 2013.**

　　　　　　　　　　　　　　　　　　**/s/ SONJA F. BIVINS**
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**